NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250802-U

NO. 4-25-0802

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 10, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Logan County |
| Petitioner-Appellee, | ) | No. 22JA11 |
| v. | ) | |
| Heidi H., | ) | Honorable |
| Respondent-Appellant). | ) | Jonathan C. Wright, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Steigmann and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding the trial court's termination of respondent
       mother's parental rights was not against the manifest weight of the evidence.

¶ 2    In June 2024, the State filed a petition to terminate the parental rights of

respondent mother, Heidi H., to her minor child, G.M. (born in June 2014). The trial court found

Heidi to be an unfit parent under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West

2024)) and determined it was in G.M.'s best interests to terminate her parental rights. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Initial Proceedings

¶ 5    On April 21, 2022, the State filed a petition for adjudication of wardship, alleging

G.M. was a neglected minor under section 2-3(1)(a), (b), and (d) of the Juvenile Court Act of

1987 (Juvenile Act) (705 ILCS 405/2-3(1)(a), (b), (d) (West 2022)). The petition alleged G.M. was not receiving adequate food, clothing, or shelter, Heidi failed to ensure a safe and nurturing environment, their residence was unclean, and Heidi "left [G.M.] without supervision for an unreasonable period of time without regard for [her] mental or physical health, safety, or welfare."

¶ 6        The trial court conducted a hearing on the same day, during which Heidi and G.M.'s father, who is not a party to this appeal, agreed to a temporary custody order. The State proffered that on April 19, 2022, officers found G.M. approximately six blocks away from her home, unsupervised. G.M. told the officers she was going to Walmart. That morning, Heidi called 911 at approximately 7:30 a.m., after discovering G.M. was missing, the home's alarm was turned off, and the back door had been opened. The State proffered this had been an ongoing issue since January 2022, as G.M. would be found "blocks away from the home without supervision, going to gas stations looking for food, things of that nature." The court entered an order granting G.M.'s temporary custody to the Illinois Department of Children and Family Services (DCFS).

¶ 7        During a hearing on June 9, 2022, Heidi admitted G.M. was neglected because she was under 14 years old and had been left "without supervision for an unreasonable period of time without regard to [her] mental or physical health, safety, or welfare." The trial court accepted Heidi's admission and found G.M. was neglected. On July 28, 2022, the court entered a dispositional order finding Heidi unfit, making G.M. a ward of the court, and placing her custody and guardianship with DCFS.

¶ 8                              B. Termination Proceedings

¶ 9        On June 27, 2024, the State petitioned to terminate Heidi's parental rights,

alleging she was an unfit parent as defined in the Adoption Act because she failed to make reasonable efforts to correct the conditions that were the basis for G.M.'s removal from her care during the nine-month periods from June 10, 2022, until March 10, 2023, from March 10, 2023, until December 10, 2023, and from September 26, 2023, through June 26, 2024, and she failed to make reasonable progress toward G.M.'s return to her care during the same nine-month periods (750 ILCS 50/1(D)(m)(i), (ii) (West 2024)).

¶ 10                                    1. *Fitness Hearing*

¶ 11            On May 1, 2025, the trial court conducted a fitness hearing.

¶ 12                                    a. Ashley Brinner

¶ 13            Ashley Brinner testified she was the DCFS caseworker assigned to G.M.'s case from April 2022 until July 2022. Brinner testified G.M. was autistic and needed "a highly structured environment to make her successful, so a routine that's consistent." G.M. had been diagnosed before this case began. Brinner informed Heidi "of places she could get information on how to work with her child with autism."

¶ 14            Brinner authored a family service plan filed in May 2022, which required Heidi to cooperate with DCFS, complete parenting classes, complete services for victims of domestic violence, maintain legal means of financial support, and maintain adequate, clean housing. During Brinner's involvement with the case, Heidi's house was consistently infested with insects, such as cockroaches and bedbugs. The issue was not resolved before Brinner left the case. Brinner referred Heidi to parenting classes and domestic violence services, but the classes had not started by the time Brinner left the case. Heidi reported she worked in a nursing home as a dietary aid, "but she never produced any verification." However, Brinner testified Heidi had legal means of support because "[s]omehow she was able to pay her rent." Brinner

acknowledged Heidi "was making efforts" to address the insect infestation in her house, as the home had been sprayed twice by Logan County Pest Control, but she did not make satisfactory progress because the infestation persisted.

¶ 15                                                    b. Bailey Volle

¶ 16          Bailey Volle, née Camp, was the DFCS caseworker who took over G.M.'s case on August 5, 2022, and she remained the official caseworker until October 3, 2023. During Volle's involvement in the case, Heidi's service plan obligations remained the same, with the exception of the domestic violence service requirements, which were removed. Volle testified Heidi did not maintain satisfactory housing "due to ongoing issues with roaches and bed bugs in the home," as well as the house's general uncleanliness. Heidi did not provide proof of employment before Volle created the September 2022 service plan, but Heidi did eventually do so. Heidi was engaging in parenting classes, and she reported she was working on getting her children up to date on their medical immunizations. Volle testified there were ongoing issues regarding Heidi's two eldest children, who were frequently tardy or absent from school, and "[t]hey were failing every class." As a result, Volle was required to "check in" on G.M.'s siblings in addition to serving as G.M.'s caseworker. Eventually, the older children started attending school consistently, and they were arriving on time. However, Heidi's house remained unclean and infested with roaches and bedbugs.

¶ 17          By June 6, 2023, none of Heidi's service plan goals had changed. While Heidi had been taking parenting classes, she did not take the final test necessary to complete the course. Heidi never completed the final test at any point during the case. Additionally, her house remained unclean and infested with insects. For comparison, G.M.'s father, who lived next door to Heidi, made his house suitable by treating it for insects and installing door alarms and locks

that were higher off the ground so G.M. could not run away as easily.

¶ 18    Volle testified Heidi's house was not so unclean that it required the removal of Heidi's other children. The insect infestation in Heidi's home was more of a concern for G.M., as compared to her siblings, because G.M. was autistic and responded more negatively to the presence of the insects, "and so she would run from the home." The home's uncleanliness affected G.M. far more than the other children, none of whom were diagnosed with autism.

¶ 19    Volle testified Heidi and G.M.'s father signed a form granting G.M.'s guardianship to DCFS in December 2022 based on how well G.M. was responding to living with her foster parent. In May 2023, Heidi and G.M.'s father signed direct consents, after which DCFS no longer offered services to them. When she signed the direct consent, Heidi was still living in her unclean, insect-infested house.

¶ 20                                   c. Heidi

¶ 21    Heidi testified she had been living in a new house since March 2024. Regarding her old house, she testified she contacted her landlord "several times" regarding the insect infestation, but the landlord refused to help. Heidi stated she could not afford to pay an exterminator while also paying her other bills. Heidi testified she voluntarily moved out of the house in question in August 2023. According to the best interests report, Heidi was evicted in Logan County case No. 23-EV-33. Heidi then lived with her aunt, saved up enough money to afford a security deposit and a few months' rent, and moved into her current residence in April 2024.

¶ 22    Heidi took an eight-week parenting course consisting of two-hour classes scheduled twice per week. Heidi testified she did not take the final test necessary to complete the course because she "was actually not informed that there was a test." Regarding her previous

home's uncleanliness, Heidi asserted, "I just couldn't afford to get what I needed in order to address that problem."

¶ 23                                    d. Unfitness Finding

¶ 24          The trial court found the State failed to prove by clear and convincing evidence Heidi failed to make reasonable efforts to correct the conditions serving as the basis for G.M.'s removal from her care. The court specifically observed that, from June 10, 2022, through March 10, 2023, Heidi's residence "continued to have [a] bug infestation, but the evidence shows that her house was treated at least two times." However, the court found the State proved by clear and convincing evidence Heidi failed to make reasonable progress toward G.M.'s return to her care during the applicable time frame. Looking at the nine-month period from June 10, 2022, until March 10, 2023, the trial court observed Heidi did not complete her parenting course and her residence "remained cluttered and bug infested." The court also highlighted that Heidi did not engage in or seek out training, education, or services relating to G.M.'s special needs due to her autism diagnosis.

¶ 25                                    *2. Best Interests Hearing*

¶ 26          On July 3, 2025, the trial court conducted a best interests hearing.

¶ 27                                    a. Best Interests Report

¶ 28          According to the best interests report prepared for the hearing, G.M. was 11 years old and in the fifth grade. She was cared for by her foster parent, Jo M., who kept her up to date on her immunizations and medical care. G.M. took medication for attention-deficit/hyperactivity disorder (ADHD). Her teachers reported G.M.'s attention and ability to focus improved after she began taking her ADHD medication, and both her behavior and her math scores improved. G.M. had an individualized education plan, and she attended speech and occupational therapy.

¶ 29          G.M. had known Jo for most of her life, and G.M. had lived with her for three years. G.M. called Jo "mom," and she was bonded to her. Jo was credentialed as a developmental therapy specialist, and she had both the knowledge and willingness to work with G.M. and her special needs. Jo provided G.M. "with a consistent routine, boundaries, and structure in the home." According to the report, Jo "encourage[d] interaction with [G.M.'s] parents and would likely maintain that relationship if appropriate."

¶ 30          Heidi and G.M.'s father originally surrendered G.M. to Jo and her former partner, Jeremiah M., who is G.M.'s maternal uncle. The report noted "an incident occurred in October 2023 between Jeremiah and Jo." The two subsequently separated, and Jo kept the house. When the report was filed, an active order of protection was in place between Jeremiah and Jo. According to the signed consents, G.M.'s parents wished for Jeremiah to adopt G.M. if Jeremiah and Jo separated. However, G.M. remained with Jo because Jeremiah did not have stable housing or employment.

¶ 31          Heidi regularly attended visits with G.M., and she would provide either dinner or a snack for G.M. and her siblings, as well as drinks. During earlier visits, "unauthorized visitors were allowed, videos were recorded, and inappropriate conversations were had between Heidi, [G.M.], and Heidi's other children." According to the report, "Heidi does not like the fact that [G.M.] is on any medication." Before DCFS became involved, none of Heidi's children were up to date on their physical, dental, or vision exams. E.H. (born in December 2017), who was seven years old at the time, had never been to the dentist. Neither A.H. (born in January 2009) nor H.H. (born in March 2010) wore the eyeglasses that had been prescribed to them. When A.H. and H.H. attended public school, they were failing their classes and had poor attendance. However, Heidi did not attend any parent-teacher conferences, and she "did not know how badly they were

failing."

¶ 32    According to the report, G.M. "gets anxious and worried and takes longer to get routine activities finished" on days when visits are scheduled. School employees and after-school program personnel have said G.M.'s attention span has shortened since the visits began and behavioral incidents have become more frequent. For example, G.M. urinated in her pants while at a day camp, something she had not done "for a long time." Jo reported G.M.'s "table manners are not appropriate" after a visit with Heidi and her "speech [was] back to how it was before all her speech therapy."

¶ 33    The report recommended that the trial court terminate the parental rights of Heidi and G.M.'s father. The report emphasized G.M. had lived with Jo since her case opened and the two had "a very strong bond." The report acknowledged Heidi made reasonable efforts to address the conditions that caused G.M. to be removed from her care, but she "ha[d] not made significant progress" after "three years and multiple attempts at services." The report stated Heidi "will not meet [G.M.'s] special needs with medication, medical exams, or education." Conversely, Jo demonstrated both the ability to meet G.M.'s special needs and a commitment "to being a safe, stable, and nurturing home."

¶ 34                                b. Jo

¶ 35    At the hearing, Jo testified she had been G.M.'s foster parent since April 20, 2022, which was when G.M. was first removed from Heidi's care. G.M. usually called her "mom" or "Jo-Jo." Jo was employed as a developmental therapist with the "Department of Human Services and Early Intervention." When Jo was working, G.M. was either at school, an after-school program, or the YMCA's summer camp. No other children or adults lived in Jo's house. Jo lived in a two-story house, and she said, "The upstairs is mainly [G.M.'s] domain."

G.M. had her own bedroom, as well as another room for her books and art supplies, which Jo called G.M.'s "little library." Jo's bedroom was on the ground floor, directly below G.M.'s bedroom.

¶ 36      G.M had an individualized education plan due to her autism and ADHD. She had recently completed the fifth grade and would be starting junior high school. G.M. attended church with Jo. She was a part of the school band and was learning to play the clarinet. G.M. loved to draw and paint. G.M. was nervous about starting junior high school because "[o]nly a few of [her] classmates are moving to the junior high with her." Jo coordinated with G.M.'s friends' parents to set up playdates and hangouts at the park. Jo testified that she worked to maintain a relationship between G.M. and her biological parents by sending them updates regarding how school was going and letting them know when community events were happening. Jo took G.M. to her counseling sessions and her neuropsychology appointments. She established a consistent daily routine with G.M. that began at 6 a.m. and lasted until her bedtime, and they followed it very closely. If the routine was disrupted, G.M. would become "moody," "aggressive," "defiant," and "discombobulated."

¶ 37      On cross-examination, Jo testified she would continue to maintain the relationship between G.M. and her parents, even if the trial court decided to terminate their parental rights. Jo testified G.M. usually transitioned easily back into her normal routine after visits with Heidi, but in a few "rare cases," a visit with Heidi had a significantly negative impact on G.M. Jo testified visits with Heidi were purposely scheduled to avoid disrupting G.M.'s routine. Jo was willing to adopt G.M.

¶ 38                          c. Heidi

¶ 39      Heidi testified she was currently living in a house purchased by her aunt and

given to her as a gift. The house had four bedrooms, one of which was a converted garage, and it was not infested with insects. The house had multiple safeguards to ensure G.M. would not run away if she returned to Heidi's custody.

¶ 40        Regarding G.M.'s prescribed medications, Heidi testified, "I don't really believe in medication. I believe it suppresses the child's personality, but if [G.M.] really needs it and it seems to be helping her, then I will make sure she will take it." Heidi insisted she "ha[d] not noticed much of a difference" in G.M. since she started taking her medication.

¶ 41        Heidi testified G.M. was close to her siblings and they all played together very well during parental visits. Heidi testified G.M. is "excited" for visits, "jumps out and runs out of the car" when she sees Heidi, and "fights" and does not want to leave when the visit is over. Heidi hoped she would be able to maintain a relationship with G.M. if her parental rights were terminated. Heidi was "confident" that she resolved the issues which caused G.M. to be removed from her care, and she believed she would be able to transition G.M. back into her home successfully.

¶ 42        On cross-examination, Heidi testified she could split her current bedroom, which was in a converted garage, into two bedrooms. If G.M. returned to her care, G.M. would sleep in one of those bedrooms. G.M.'s siblings were being homeschooled, but Heidi would not remove G.M. from public school because G.M. "loves to be around [other] children," and "if she chooses she want [*sic*] to stay in the junior high, that's where she will be." Heidi testified she would continue taking G.M. to counseling.

¶ 43                                  d. Guardian *ad Litem*

¶ 44        After the parties rested, the guardian *ad litem* (GAL) proffered G.M. "describes her current placement as calming and loving." G.M. "describes her interactions with the siblings

and with [Heidi] as fun, but chaotic. Stressful, but fun." Ultimately, the GAL asserted G.M. "craves stability and routine, and she gets that in her current placement." Being around Heidi and her siblings "creates chaos in her mind."

¶ 45                                     e. Best Interests Finding

¶ 46        The trial court found it was in G.M.'s best interests to terminate Heidi's parental rights. In delivering its judgment, the court found G.M.'s current placement best served her physical safety and welfare because Jo was trained as a developmental therapist for special needs children. In Jo's home, G.M. had her own bedroom and a separate room "for her art and music and opportunity to pursue creative interests." The court highlighted Heidi's testimony asserting she did not notice any difference in G.M.'s behavior after she began taking medications, and it found the evidence refuted Heidi's claim. The court found G.M. was thriving in her current placement "because of her structure and also the counseling and medical attention she's getting, including the medication." The court also expressed concern regarding Heidi's testimony that G.M. would remain in public school if that was what G.M. chose. The court emphasized, "[G.M.] is thriving because she's in a structured environment at school. And leaving that decision to an 11-year-old who is struggling with autism and ADHD, as well as just being 11 years old, is not a proper path to take." The court found G.M.'s senses of attachment and security were most strongly found with Jo, who provided G.M. with the structure she needed. Additionally, G.M. was going to start junior high school, which would be a significant change in her routine, and G.M. would need as much structure and familiarity as possible. G.M. had been in her current placement for approximately three years, and her need for permanency favored terminating Heidi's parental rights.

¶ 47        This appeal followed.

¶ 48                                    II. ANALYSIS

¶ 49        On appeal, Heidi contends the trial court's unfitness and best interests findings were against the manifest weight of the evidence. We disagree.

¶ 50                                A. Unfitness Finding

¶ 51        "The State must prove parental unfitness by clear and convincing evidence." (Internal quotation marks omitted.) *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011). A determination of parental unfitness involves factual findings and credibility determinations which the trial court is in the best position to make because its "opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 52        The Adoption Act provides several grounds on which a trial court may find a parent unfit. "[S]ufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83. Here, the trial court found Heidi was an unfit parent as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)). Section 1(D)(m)(ii) provides, in relevant part, that a parent is unfit for failing "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2024). "If a service plan has been established ***, 'failure to make reasonable progress toward the return of the child

- 12 -

to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan." 750 ILCS 50/1(D)(m)(ii) (West 2024).

¶ 53       Here, the trial court's determination Heidi was unfit for failing to make reasonable progress toward G.M.'s return to her care during the nine-month period from June 10, 2022, until March 10, 2023, was not against the manifest weight of the evidence. The service plans required Heidi to cooperate with DCFS, complete parenting classes, maintain legal means of financial support, and maintain a clean housing situation free of hazards. At no point during the pendency of the case did Heidi take the final test necessary to complete her parenting course. More importantly, her house remained unclean and infested with roaches and bedbugs until she was evicted in August 2023. For comparison, G.M.'s father, who lived next door to Heidi, treated his house for insects, installed door alarms, and put in locks located higher off the ground. Heidi testified she could not afford to address the infestation, but she provided no explanation as to why she remained in the cockroach-and-bedbug-riddled house until August 2023—more than a year after G.M. had been removed from her care. We are also deeply disturbed by Heidi's misrepresentation of the circumstances leading to her departure; the record indicates she did not voluntarily move out of her unclean house, which served as a significant obstacle to G.M.'s return to her custody, but rather, she chose to continue living there until she was evicted.

¶ 54       Based on Heidi's failure to fulfill her obligations under the service plan during the relevant nine-month period, we cannot say the trial court's unfitness finding stands against the manifest weight of the evidence because the opposite finding is not readily apparent. See *N.B.*, 2019 IL App (2d) 180797, ¶ 30; 750 ILCS 50/1(D)(m)(ii) (West 2024).

¶ 55                         B. Best Interests Finding

¶ 56     After a parent is found unfit, "the focus shifts to the child." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The issue ceases to be "whether parental rights can be terminated" and becomes "whether, in light of the child's needs, parental rights should be terminated." (Emphases omitted.) *D.T.*, 212 Ill. 2d at 364. The trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Act (705 ILCS 405/1-3(4.05) (West 2024)). See *In re T.A.*, 359 Ill. App. 3d 953, 959-60 (2005). Those factors include: the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background and ties; the child's sense of attachments, including where the child feels loved, attached, and valued; the child's sense of security, familiarity, and continuity of affection; the child's wishes and long-term goals; the child's community ties; the child's need for permanence; and the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West 2024). We will not overturn a court's best interests finding unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 57     Here, the best interests factors support the termination of Heidi's parental rights. G.M. had lived with Jo for more than three years, and the two had "a very strong bond." Jo demonstrated both the ability to meet G.M.'s special needs and a commitment "to being a safe, stable, and nurturing home." The best interests report asserted Heidi "will not meet [G.M.'s] special needs with medication, medical exams, or education."

¶ 58     During the best interests hearing, the trial court astutely observed the evidence did not support Heidi's testimony that G.M.'s behavior remained unchanged after she began taking her prescribed medication. Similarly, the court properly decried Heidi's testimony that she would let G.M. remain in school "if [G.M.] chooses." Because of her autism diagnosis, G.M. thrived within the confines of a precise, regimented, and structured schedule. The record clearly

demonstrates Jo provided G.M. with the structure she needed. During her testimony, Jo laid out a detailed, hour-by-hour breakdown of her daily routine with G.M. Jo was a developmental therapist with special training to meet G.M.'s needs. Jo was willing to provide permanency by adopting G.M. In Jo's house, G.M. had her own bedroom and another room dedicated to fostering her creative endeavors. If G.M. returned to Heidi's care, Heidi would have to divide her current bedroom, which was in a converted garage, into two separate rooms so G.M. would have her own place to sleep.

¶ 59　　　　Based on G.M.'s unique needs and significant reliance on structure and Jo's proven ability and willingness to meet those needs and provide that structure, the trial court's finding it was in G.M.'s best interests to terminate Heidi's parental rights was not against the manifest weight of the evidence. See *T.A.*, 359 Ill. App. 3d at 961. Thus, we cannot say the court erred in terminating Heidi's parental rights.

¶ 60　　　　　　　　　　　　　III. CONCLUSION

¶ 61　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 62　　　　Affirmed.